STATE

v.

Joseph R. SZAREK.

No. 80–27–C.A.

Supreme Court of Rhode Island.

Aug. 3, 1981.

Dennis J. Roberts, II, Atty. Gen., Jeffrey B. Pine, Sp. Asst. Atty. Gen., for plaintiff.

McKinnon & Fortunato, Amy R. Tabor, Steven J. Fortunato, Jr., Pawtucket, for defendant.

## OPINION

MURRAY, Justice.

On November 30, 1978, a two-count criminal information was filed against the defendant, Joseph R. Szarek (Szarek), in the Washington County Superior Court. Specifically, the information in count 1 charged the defendant with failing to stop after he was knowingly involved in an automobile accident which resulted in a person's death.[1] Count 2 charged Szarek with operating a motor vehicle at a time when his license was suspended.[2] After a trial before a judge and a jury of the Superior Court, a guilty verdict was entered against the defendant on both counts.

A review of the record discloses the following facts. On September 27, 1978, at approximately 9:30 p. m., Philip Abrams and his wife decided to take their new car out for a ride to Bonnet Shores from their home in Narragansett. As they passed Sprague Bridge on Boston Neck Road, they noticed a "youngster" riding a motorbike near the bridge. They passed the youth and continued on until just before they reached Bonnet Shores, at which point they turned around and headed for home. On their way back, they spotted the youngster lying on the side of the road beside his motorbike. Philip, who was driving at the time, pulled his car over to the side of the road, jumped out of the car, and ran over to the youth. He attempted to ascertain if the youth was all right but the youth, who was unconscious at the time, did not respond. Fearing that the youth was seriously injured, Philip then ran back to his car and drove to the Narragansett police headquarters, where he informed the authorities of the injured youth's whereabouts.

Shortly thereafter, Sergeant Dennis J. O'Brien (O'Brien) of the Narragansett police department received a call on his radio from the dispatcher, requesting him to respond to reports of an auto accident on Boston Neck Road. Upon his arrival at the scene, he and an unnamed reserve officer who was riding with him observed a boy lying on the side of the road next to a "small engine" Honda motorcycle. The reserve officer rendered the boy whatever medical assistance he could until an ambulance arrived at the scene. The boy was transported by ambulance to South County Hospital and later to the Miriam Hospital where he died early the next morning.

Sergeant O'Brien's preliminary opinion was the boy had driven into the telephone pole himself; however, he and the other investigating officers later concluded that the motorbike was struck by another vehicle before it collided with the telephone pole. Consequently, they embarked upon an exhaustive and thoroughly professional investigation which ultimately resulted in defendant's arrest.

The defendant's trial on the above charges began on June 25, 1979, in the

1. In violation of G.L. 1956 (1968 Reenactment) § 31-26-1, as amended by P.L. 1978, ch. 208, § 1.

2. In violation of G.L. 1956 (1968 Reenactment) § 31-11-18.

Washington County Superior Court. Prior to the trial justice's submission of the case to the jury, defendant moved for a judgment of acquittal. The motion was denied by the trial justice, and his denial of the motion forms the basis of defendant's appeal.

 It is well settled that in considering a motion for judgment of acquittal, the trial justice is limited to an evaluation of that evidence which the state contends affords a requisite basis for submitting the case to the jury. The trial court and this court on appeal are bound to view the evidence in the light most favorable to the state, drawing therefrom all reasonable inferences consistent with the accused's guilt. Neither the weight of the evidence nor the credibility of witnesses is before the court at that time. *State v. Golden*, 430 A.2d 433 (R.I., 1981); *State v. Roddy*, R.I., 401 A.2d 23, 32 (1979).

The statute under which defendant was charged is G.L. 1956 (1968 Reenactment) § 31–26–1, as amended by P.L. 1978, ch. 208, § 1, and it provides:

"(a) The driver of any vehicle knowingly involved in an accident resulting in injury to or death of any person shall immediately stop such vehicle at the scene of such accident or as close thereto as possible but shall then forthwith return to and in every event shall remain at the scene of the accident until he has fulfilled the requirements of § 31–26–3. Every such stop shall be made without obstructing traffic more then is necessary.

"(b) Any person failing to stop or to comply with said requirements under such circumstances shall upon conviction be punished by imprisonment for not more than five (5) years and/or fined up to five thousand dollars ($5,000)."

On appeal, defendant contends that the state failed to present adequate proof that the vehicle he was driving that evening was the one involved in the collision and that he was the driver of the vehicle involved in the collision. Furthermore, he contends that the state failed to demonstrate that he was knowingly involved in an accident.

In analyzing these contentions, it would be well, at this point, to review some of the other testimony adduced at trial. With respect to defendant's contention that there was inadequate proof that the vehicle he was driving on September 27, 1978, was involved in a collision, we find an abundance of evidence which could properly be submitted to the jury on this issue. One Patricia L. Stormont (Patricia) of Jamestown, defendant's girl friend, testified that on September 27, 1978, she was the owner of a Ford Econoline van, colored white with yellow trim. On the afternoon of that date, she and defendant drove to Narragansett in the van. Before they reached their destination, however, they had an argument; and as a result, Patricia stopped the van, got out, and took a bus back to Jamestown. She left the keys to the van in the ignition.

Ray F. Clayton (Clayton), another friend of Szarek, testified that defendant came to his house in Narragansett on the evening of September 27, 1978. According to Clayton, Szarek was driving a white van with "yellow on it." After a few minutes, Szarek and Clayton got into the van and drove to the Neptune Lounge in Narragansett, arriving at approximately 9 p. m. After a half hour or so, Szarek told Clayton he was leaving.

There is also testimony of Marilyn Haxton, who testified that at approximately 9:30 or 9:45 p. m. that evening she was with her family at home on Boston Neck Road to Narragansett when she became aware that someone was in her driveway. A man whom Mrs. Haxton did not recognize came to her kitchen window and asked her if she knew a friend of his from Narragansett. She then asked this man to leave, and he did. After two or three minutes elapsed, she saw a white van with yellow or red trim on it pull into her driveway. She notice that the right front tire of the van was flat and that it made a thumping noise as it rolled along the pavement. Mrs. Haxton became suspicious, and she recorded the license-plate number of the van. She watched as the van proceeded around her

circular driveway and headed out back onto Boston Neck Road. At trial, Mrs. Haxton identified defendant as the one who came to her kitchen window immediately prior to her seeing the van in her driveway.

On the morning of September 28, 1978, Detective Inspector William A. Mellen (Mellen) of the Narragansett police[3] took charge of the investigation. As a result of a phone call received in the police department while he was at the accident scene, Detective Mellen tracked down the owner of a vehicle whose license plate was given to the police by the caller. The vehicle having that license-plate number was a white Ford Econoline van with a yellow-gold band around its lower portion.

Perhaps the most telling evidence was supplied by the University of Rhode Island's Crime Laboratory, to which the Narragansett police sent certain materials for testing. Doctor Anton Mohrnheim, a metallurgist who occasionally acted as a consultant to the crime lab, performed certain tests upon a portion of the clothing taken from the victim and upon the paint scrapings from the van.[4] As a result of the tests he performed, Dr. Mohrnheim was of the opinion that the paint on the victim's clothing was derived from the same source as the paint scraped from the van. In addition, Dr. Mohrnheim's report, which was admitted into evidence, indicated that pieces of tire taken from the van's right-front tire came from the same source as pieces of tire found lodged in the kickstand of the motorbike.

With regard to the issue of whether the van seized by the Narragansett police was the one involved in the accident, defendant contends that the laboratory report and the oral testimony of Dr. Mohrnheim have no probative value because there was no evidence presented as to the percentage of motor vehicles having paint of a chemical composition similar to that of the van in question. This argument is lacking in merit as it goes to the weight, and not the admis-

sibility, of the evidence; and, as stated above, the weight of the evidence is neither for us nor the trial justice to consider in passing on a motion for judgment of acquittal. The jury was free to attach whatever significance it deemed appropriate to the proffered evidence.

It is true that all of the above evidence connecting this vehicle to the accident is circumstantial; however, we no longer make any distinction between direct and circumstantial evidence in terms of its probative value. *State v. Roddy*, R.I., 401 A.2d 23, 35 (1979); *State v. Rose*, 112 R.I. 402, 407, 311 A.2d 281, 284 (1973). We conclude from the above that there was an abundance of legally sufficient and probative evidence to go to the jury on the issue of whether the van in question was the one involved in the fatal collision on Boston Neck Road on September 27, 1978.

The defendant's second contention, that there was *no* evidence to submit to the jury on the issue of whether he was the driver of the vehicle involved in the accident is similarly lacking in merit. In addition to the facts stated above, which need not be repeated here, we have the additional testimony of Detective Mellen that Haxton's driveway is only approximately 150 feet, more or less, from the scene of the accident. This together with Mrs. Haxton's testimony places defendant and the van extremely close to the scene of the accident at a time not inconsistent with the state's theory that defendant was the driver of the van in question. Furthermore, one Robert J. Laprade (Laprade), another of defendant's friends, testified that at around 10 p. m. on September 27, 1978, he was at his home on Pepperbush Trail in Narragansett when he heard a "rumbling" sound in his driveway. The defendant then walked into Laprade's house and informed him that he had had a "blowout" on his right-front tire. Laprade went out to his driveway and saw there a white van with a flat front-tire. Laprade

---

**3.** Detective Mellen had retired from the police force prior to the time of the trial.

**4.** The paint scrapings were taken directly from the van by Dr. David R. DeFanti, director of the state crime laboratory.

further testified that he lived approximately a mile or a mile and a quarter from the scene of the accident.

■ Although we agree that mere presence at or near the scene of a crime in and of itself is not sufficient to prove an element of a crime beyond a reasonable doubt, we are of the opinion that it is a factor that the jury can take into account in reaching its verdict. Taking all of the evidence relative to the identity of the driver of the vehicle involved in the collision in the light most favorable to the state, we conclude that such evidence was sufficient for the trial justice to submit it to the jury for its determination.

■ The next issue raised by defendant is whether the state failed to show that defendant was knowingly involved in a collision causing injury or death. There is again an absence of any direct evidence bearing on defendant's knowledge that he was involved in a collision; however, in cases of this nature, courts have recognized that direct evidence of the accused's actual knowledge is frequently unavailable, especially in cases in which the accused does not testify, as in the instant case. *See, e. g., State v. Minkel,* 89 S.D. 144, 230 N.W.2d 233 (1975). Accordingly, courts have allowed the requisite *scienter* to be established by circumstantial evidence.[5] *State v. Lee,* 53 Ariz. 295, 88 P.2d 996 (1939); *People v. Rocovich,* 269 Cal.App.2d 489, 74 Cal.Rptr. 755 (1969); *State v. Minkel,* 89 S.D. 144, 230 N.W.2d 233 (1975).

Turning now to the proof adduced in the instant case, it was established in addition to all of the factors already discussed at pp. 195–196 *supra,* through the use of photographs that were introduced into evidence, that the right front and side of defendant's van sustained damage. The youth's motorbike was also extensively damaged. Furthermore, Philip Abrams testified that the

portion of the road where the collision occurred was well lighted and that the weather was good on the night in question.

Another item not to be overlooked in this regard is the seriousness of the victim's injuries. At least one court has held that a collision so serious that it results in death may, in itself, be sufficient for an inference of knowledge, absent a showing of extraordinary circumstances. *State v. Minkel,* 89 S.D. at 147, 230 N.W.2d at 235. While we are not prepared to go as far as the South Dakota Supreme Court did, we are of the opinion that the seriousness of the injuries are yet another factor for the jury to consider in determining whether a defendant had knowledge that he was involved in an accident resulting in physical injury or death.

■ Taking all of the above factors into account, i. e., the location and the extent of the damage to the van, the extent of the damage to the motorbike, the lighting and the weather conditions at the scene on the evening in question, the seriousness of the victim's injuries, and defendant's actions after 9:30 or 9:45 p. m. on the night in question, we are of the opinion that the trial justice properly submitted this issue to the jury. This evidence, when viewed in the light most favorable to the state, was sufficient to support an inference that Szarek knew or should have known that he was involved in an accident causing injury or death.

■ The defendant next contends that the trial justice erred in denying his motion for judgment of acquittal on count 2 of the criminal information charging him with driving at a time when his license to operate a motor vehicle was under suspension.

We note the following relevant facts. According to documents introduced into evi-

---

5. Under this type of statute, the requisite *scienter* is not limited to the actual knowledge of the driver. A violation of the statute also occurs in cases in which the evidence indicates that the driver reasonably should have known that he was involved in an accident resulting in injury or death. *State v. Porras,* 125 Ariz. 490, 610 P.2d 1051 (1980); *see also People v. Nunn,* 65 Ill.App.3d 981, 22 Ill.Dec. 607, 382 N.E.2d 1305 (1978) (dicta); *State v. Feintuch,* 150 N.J.Super. 414, 375 A.2d 1223 (1977) (Proof of impact alone held sufficient to raise an inference of knowledge sufficient to withstand a motion for judgment of acquittal).

dence by the state, defendant received a summons for a traffic violation on May 10, 1978. He was fined $20 for that violation, but he neither appeared at the scheduled hearing nor paid the fine for the violation. The Department of Transportation thereupon suspended his license indefinitely until defendant paid the fine.

At trial, the state called John J. Gorman (Gorman), an investigator for the Registry of Motor Vehicles, who testified that it is the ordinary course of business and the usual practice of the registry to issue suspension orders in triplicate. The registry keeps one of the copies for its files, sends another copy to the Administrative Adjudication Division, and sends the third copy to the licensee. On cross-examination, however, Gorman testified that there was nothing in his records to indicate that the registry had ever sent this third copy to Szarek. Gorman also testified that his records indicated that the registry received payment of the fine on August 16, 1978, and that Szarek's license was reinstated on January 8, 1979.

The defendant contends that he never received notice of the suspension of his license and that without such notice there is no evidence to prove that he knowingly operated a motor vehicle while his license was suspended. The defendant raises a novel question of whether notice is required as a prerequisite for conviction under G.L. 1956 (1968 Reenactment) § 31–11–18 [6] and its more recent amendments; however, we need not decide that issue, for there was evidence from which the trial justice could properly infer that Szarek had actual knowledge of his suspension.

Such knowledge can be inferred from the fact that Szarek paid $20 to the registry on August 16, 1978. It is unlikely that Szarek paid the money to the registry as a gift.

What is more likely is that Szarek knew, either from receipt of the summons [7] or from the suspension order that he had to pay the fine in order to avoid or to lift suspension of his license, whatever the case may have been. Certainly this issue was a matter that was properly submitted to the jury for determination.

Finally, the defendant contends that because his suspension order was marked "cleared" on August 16, 1978, the date the registry received payment, his license was not under suspension on the date in question. We note, however, Gorman's testimony that a "clearing" of a license is not the same as a reinstatement of it and that Szarek's license was not reinstated until January 8, 1979. We find from the above that there was sufficient evidence for the trial justice to submit this issue to the jury.

Accordingly, the defendant's appeal is denied and dismissed. The judgment of conviction entered against the defendant is affirmed, and the case is remanded to the Superior Court.

---

**6.** General Laws 1956 (1968 Reenactment) § 31–11–18(a), at that time provided:

"Any person who drives a motor vehicle on any highway of this state after his application for a license has been refused, or at a time when his license to operate is suspended, revoked or cancelled, shall be guilty of a misdemeanor."

**7.** We note that a warning that failure to pay for a ticket or a summons will result in a suspension of the violator's driving privileges is printed on the back of each summons issued in the state.