STATE

v.

Richard E. BAKER, Jr.

No. 90–579–C.A..

Supreme Court of Rhode Island.

June 28, 1993.

**836**

Jeffrey Pine, Atty. Gen., Annie Goldberg, Aaron Weisman, Asst. Attys. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

FAY, Chief Justice.

The defendant, Richard E. Baker, Jr., appeals from a jury conviction of leaving the scene of an accident resulting in personal injury in violation of G.L.1956 (1982 Reenactment) § 31–26–1 and § 31–26–3.

On April 30, 1988, a bachelor party was held at the North Kingstown Country Club (club) in honor of the final days of bachelorhood of William Slater, Jr. (Slater). The afternoon consisted of eighteen holes of golf followed by a meal and an open bar. As is unfortunately commonplace during the course of many bachelor parties, the combination of celebration, male ego, and ingestion of alcohol led to an excess of distressing incidents. There are two distinctly different interpretations of the events that occurred on the night of the party. We begin with the state's interpretation of what happened that evening.

Officer Benjamin Nickelson of the North Kingstown police department testified that he responded to a call from Carter's 19th Hole (Carter's), a restaurant and pub located adjacent to the club. Upon arrival, he observed a large gathering of men in the parking lot and the victim, Paul MacDonald (MacDonald), lying face down in a pool of blood. Parts of MacDonald's face and his left ear were peeled back and his clothing had been abraded, causing muscle groups to be visible. Nickelson examined tire tracks and upon further investigation noted that they were composed of MacDonald's blood and skin.

MacDonald testified that at approximately 11 p.m. guests began to congregate around the putting green. Upon his joining this group, a fight ensued, and MacDonald was struck in the face. After spending fifteen minutes in the clubhouse applying ice to his face, he joined some friends who had gathered in the parking lot. As he and his friends were walking toward a vehicle, he heard someone shout, "[H]e's coming back." The next thing MacDonald remembered was seeing headlights, and then his memory faded from that point. MacDonald was struck by a truck and dragged approximately sixty feet. As a result MacDonald lost his left ear, and his right ear and the right side of his chest and his right arm were severely damaged. During the first seven days of his hospitalization MacDonald underwent five operations and likened the physical results of his accident to a shark attack. Along with MacDonald, Jonathan McCrory (McCrory) was also struck by the truck and sustained a broken right wrist and various abrasions.

Robert Costello (Costello), an employee of Carter's, and one of the few witnesses not associated with any of the parties involved in this suit, stated that at one point in the evening a disturbance arose in the parking lot. Costello went into the parking lot to investigate and noticed a group of about twenty men vandalizing a red truck. He watched the truck leave the parking lot and travel about a quarter of a mile down the road into another parking lot. The truck remained there for about two minutes and then started back toward the club. Costello warned the men in the parking lot

to "look out, because the truck is coming back." The truck turned into the parking lot and headed toward the group of men, striking two of them, dragging one while the other bounced off the hood of the vehicle. The truck struck a parked car, reversed direction, struck another car, and drove away.

Peter Fitzpatrick (Fitzpatrick), a friend of Slater's, entered the parking lot and saw a group of ten to twenty men hitting and kicking defendant's truck. The group was yelling at defendant to leave the party. Fitzpatrick stated that defendant's truck was driven from the parking lot and "a couple of minutes later" returned and accelerated into a group of fifteen to twenty men. Fitzpatrick admitted there was "quite a lot of drinking" and stated that he had had eight beers from 7:30 to 11 p.m.

Michael Rich (Rich), another friend of Slater's, described the bachelor party as a restrained and calm affair. We do not see the events of that evening as a restrained or a calm affair. The record reflects that there was an open bar that was enthusiastically patronized by the invitees. The record also reflects that as part of this so-called restrained and calm affair an unassuming invitee went to use a portable toilet, which was tipped over while he was using it. When helped out of the portable toilet, the man was covered in urine and excrement. Rich's view of this restrained and calm affair may also not have taken into consideration a group of party-goers congregating in the back of the building "shotgunning" beers.[1]

Rich testified that he was inside Carter's when he was informed there was a commotion in the parking lot. As he entered the parking lot, he noticed a group of ten to fifteen men around two trucks, a red one and a gray one. Rich stated that there were only two to three men actively involved in an altercation with defendant.

Rich noted that a window in defendant's truck appeared to have been smashed. Rich watched as defendant left the parking lot in the red truck and two to three minutes later heard the sound of a vehicle approaching at a rapid rate of speed. When it became apparent that the truck was going to turn into the parking lot, Rich ran for safety between two parked cars. He heard "a very loud thud," and he "knew that someone had been hit." Rich identified defendant as the driver of the truck because when he saw defendant leave the party, he was wearing a white T-shirt, and the driver of the truck was wearing a white T-shirt. After the truck hit the men, Rich heard something or someone being dragged by the vehicle. Rich testified that the truck left the parking lot in a "zig zag" manner that Rich believed was a further attempt to hit other men.

Mark Silvia (Silvia), a friend of Slater's, testified that he first became aware of defendant after the commotion around the putting green. He stated that defendant appeared upset, and because he knew defendant, Silvia went over to him to try to calm him down. Silvia testified that later in the evening he decided to go into the parking lot. When he entered the parking lot, he saw a large group of men surrounding a truck and heard defendant's father exclaiming, "[W]hy are you doing this?" Several men had defendant's father pinned against the side of a truck. Silvia testified that he pulled the men off defendant's father and told them to leave him alone. Silvia walked around to the side of the truck and saw "guys beating the crap out of [defendant]." The defendant was in his truck with the seat belt fastened, and men were punching him through the open window. The defendant was "getting hit a lot on—on the side of the head and [his face] by at least seven to ten men." The defendant tried repeatedly to roll up the window,

---

1. "Shotgunning" a beer is a term that describes what some would say is a rather creative way of expeditiously drinking a beer. In order to shotgun a beer, one must be drinking from a can. Before opening the can of beer, the beer drinker punctures a small hole in the side of the can. The beer drinker then holds the side of the can to his or her mouth as he or she opens the beer can by pulling the tab. The sudden release of air pressure thrusts the contents of the can into the beer-drinker's mouth through the hole, enabling the beer drinker to drink the entire can of beer in about three to four seconds.

and it was subsequently shattered by a wayward fist. The defendant continued to try to roll up the window, even after it broke. Silvia testified that at this point in the evening defendant was not wearing any type of shirt. Silvia pushed the men back and pleaded with them to leave defendant alone because "he's had enough." The defendant was covered by a "massive amount of blood." The defendant drove his truck from the parking lot, with his face "a mass of blood," and he subsequently returned, struck a man, and dragged him beneath the truck. Silvia testified that he saw defendant driving the truck as it reentered the parking lot. Silvia testified that after defendant's truck struck the men, he pleaded with defendant to stop. Silvia stated that he was yelling, but defendant could not hear him. Silvia testified that it appeared defendant did not know who Silvia was.

Thomas Hoxie (Hoxie), defendant's brother-in-law, testified that he, defendant, and defendant's father arrived at the party between 6 and 7 p.m. Hoxie testified that in the area of the putting green six or seven men were involved in wrestling matches, and inside Carter's there were men involved in arm-wrestling matches. Hoxie stated that during the course of the evening he had seven to eight beers and a shot. As Hoxie, defendant, and defendant's father were leaving the party, an unidentified man tried to punch defendant. The defendant swung back and struck the man. During the melee that followed, it seemed "everybody wanted to fight at this point." The group managed to leave by the rear of the building. Upon arriving at their trucks, they were greeted by several men who exclaimed, "[C]'mon lets fight some more, what's the matter are you chicken?" As Hoxie and defendant entered defendant's truck, a group of men encircled it. Hoxie testified that they did not want to leave because defendant's father was not yet in his truck. When they did try to leave, several men jumped in front of the truck to block their path. The defendant got out of his truck, and four men started fighting with him. Others joined in and started banging on defen-

dant's truck. There were approximately ten people involved in the confrontation. Hoxie tried to grab some of the men and was subsequently punched. Hoxie could see defendant lying across the front seat of the truck "with his face all cut up and bleeding everywhere, and there was blood all over the place." Men were reaching through the driver's-side window, punching defendant in the face. Hoxie was subsequently struck by a punch and then slammed headfirst into the side of the truck. During the fracas Hoxie overheard Slater saying, "[G]et him, kill him, you're getting what you deserve." Hoxie left Carter's with defendant's father. Hoxie testified that they followed defendant to his house and that at no point did defendant turn the vehicle around and return to the parking lot. Hoxie stated that defendant was "maybe a minute" ahead of them and that when they arrived at defendant's house, defendant's truck was already there. Hoxie and defendant's father found defendant in the shower, dazed, and "bleeding all over his face."

The testimony of defendant's father, Richard Baker, Sr. (Baker), substantially corroborated Hoxie's testimony. Baker testified that during the course of the evening he had approximately six or seven rum and cokes. Baker stated that after the meal the party began to get a little rowdy with beer drinking and with men arm wrestling and throwing biscuits. He testified that some men who had played ice hockey with Slater were getting rowdy and "having a pretty good time." Baker testified that after the melee defendant's face looked like a "pound of hamburger * * * his eyes were little beads, he could hardly see, and there was blood all over the place and little square crystals of glass in his face." The defendant's eyes were swollen, his nose was broken, blood was running from his ears, and his mouth looked like "someone had hit him with a baseball bat."

The defendant testified that he had arrived at the party at approximately 6:30 p.m. and during the course of the evening consumed six to eight beers and a shot. He testified that the fracas started as he

was leaving the party. As he walked by the men who were wrestling, he said, "[W]hat's up," whereupon he was rushed by a group of men. An altercation occurred, and after things calmed down, defendant wished to leave the party. He walked to the parking lot and entered his truck but did not immediately leave because a group of men approached his father, and he thought they were going to attack him. He remembers getting out of his truck and people hitting him; "after that, it's all a daze of just feeling pain, everything blurs." He testified that there were probably eight people taking turns hitting him and holding him down. Several men were trying to pull him out of his truck from both sides of the vehicle. The defendant thought the group of men were going to kill him. The defendant stated that he must have "started up [the truck] and threw it into a gear and wherever it went it went. I have no recollection. The next thing I knew I was home." The defendant did not have any memory of turning his truck around and reentering the parking lot. After defendant's wounds were cleaned up, he and his father proceeded to a State Police station to report the assault. He was directed to go to the North Kingstown police department because North Kingstown was handling the matter. Upon arrival at the North Kingstown police station, he was arrested because of an accident involving his truck. The defendant subsequently informed police he was unaware of any accident involving his truck.

The defendant was charged with five criminal offenses: assaulting MacDonald with a dangerous weapon, assaulting McCrory with a dangerous weapon, leaving the scene of an accident with injury resulting to MacDonald, leaving the scene of an accident with injury resulting to McCrory, and assault resulting in serious bodily injury. The jury convicted defendant of leaving the scene of an accident with injuries resulting to MacDonald. The defendant was acquitted on the remaining charges.

The defendant contends that the trial justice erred (1) by denying his motion for judgment of acquittal, (2) by denying his motion for a new trial, and (3) by improperly finding that the evidence was sufficient to support the premise that defendant's failure to remain at the scene of the accident was unreasonable.

■ The defendant's first contention is that the trial justice erred in declining to grant his motion for judgment of acquittal of the charge of leaving the scene of the accident resulting in serious injuries to McDonald. The defendant believes that there was insufficient evidence to show that he had actual knowledge of the collision. The defendant avers that § 31–26–1(a) requires actual, rather than constructive, knowledge of the collision. The state asserts that the evidence was sufficient to show that defendant knew or should have known that he was or had been involved in an accident resulting in injury.

■ Section 31–26–1(a) provides:

"The driver of any vehicle knowingly involved in an accident resulting in injury to or death of any person shall immediately stop such vehicle at the scene of such accident or as close thereto as possible but shall then forthwith return to and in every event shall remain at the scene of the accident until he has fulfilled the requirements of § 31–26–3. Every such stop shall be made without obstructing traffic more than is necessary."

Section 31–26–3 sets out certain procedures a motorist must follow after a collision. The Legislature intended the term "accident" to include all automobile collisions, intentional as well as unintentional. *State v. Smyth*, 121 R.I. 188, 397 A.2d 497 (1979). The purposes of a statute like § 31–26–1(a) are numerous. The statute precludes those involved in accidents from escaping liability and ensures that anyone injured receives the proper medical assistance. The statute also facilitates accident investigation and preserves the public order while encouraging and advancing public safety. *See Comstock v. State*, 82 Md.App. 744, 573 A.2d 117 (1990); *Johnson v. Commonwealth*, 14 Va.App. 769, 418 S.E.2d 729 (1992).

■ Our flagship case on § 31–26–1(a) is *State v. Szarek*, 433 A.2d 193 (R.I.1981).

A review of *Szarek* is warranted to clarify a misconception made by defendant. In *Szarek* the defendant argued that the state had failed to show that he had the requisite knowledge that his vehicle had struck a child on a motor bike. In discussing the absence of any direct evidence bearing on the defendant's knowledge of the collision, we recognized that direct evidence of the accused's actual knowledge is frequently unavailable. *Id.* at 197. In reviewing § 31–26–1(a) and statutes similar to it, we noted that

> "[u]nder this type of statute, the requisite *scienter* is not limited to the actual knowledge of the driver. A violation of the statute also occurs in cases in which the evidence indicates that the driver reasonably should have known that he was involved in an accident resulting in injury or death." *Szarek,* 433 A.2d at 197 n. 5.

The defendant contends that the constructive, "should have known," standard applies to one's knowledge of the injury or death and does not apply to one's knowledge of the accident or collision. Consequently defendant argues that to be convicted, he must have had actual, subjective knowledge of the accident. We believe that defendant has misread the *Szarek* decision and the extra-jurisdictional cases cited supporting our scienter analysis.

In *Szarek* we made reference to *State v. Porras,* 125 Ariz. 490, 610 P.2d 1051 (1980); *People v. Nunn,* 65 Ill.App.3d 981, 22 Ill. Dec. 607, 382 N.E.2d 1305 (1978); and *State v. Feintuch,* 150 N.J.Super. 414, 375 A.2d 1223 (1977). The defendant believes that these cases require actual knowledge of the collision while the knowledge of the injury or death may be from constructive knowledge. We do not agree.

"In discussing whether *defendant knew or should have known* of the impact, the trial judge was merely assessing the probative force of the inference of *defendant's knowledge of the happening of the accident * * *.*" (Emphasis added.) *Feintuch,* 150 N.J.Super. at 423, 375 A.2d at 1227–28. "Furthermore, *whether a driver knew or should have known of his involvement in an accident* may be demon-strated by inferences arising from the circumstances of the accident * * *.*" (Emphasis added.) *Nunn,* 65 Ill.App.3d at 985, 22 Ill.Dec. 610–11, 382 N.E.2d at 1308–09. It was quite clear when we wrote *Szarek* that we were adopting a "knew or should have known" standard in evaluating the knowledge required of a defendant when he or she had been involved in an accident. We hope we have cleared up any questions defendant may have had concerning the impact of the *Szarek* decision.

■ The standard for reviewing a motion for judgment of acquittal is well settled in this jurisdiction. A trial justice is

> "limited to an evaluation of that evidence which the state contends affords a requisite basis for submitting the case to the jury. The trial court and this court on appeal are bound to view the evidence in the light most favorable to the state, drawing therefrom all reasonable inferences consistent with the accused's guilt. Neither the weight of the evidence nor the credibility of witnesses is before the court at that time." *Szarek,* 433 A.2d at 195.

A motion for judgment of acquittal should be granted when the evidence is insufficient to support a finding of guilt. *State v. O'Dell,* 576 A.2d 425, 428 (R.I.1990). There was testimony from both the state's witnesses and the defense witnesses that defendant had suffered a severe beating, absorbing many blows to the head. The record also reflects that upon his reentry into the parking lot, defendant could not hear the pleadings of Silvia, nor did he acknowledge him. Silvia testified that defendant's head "just kept bobbing back" and that his face was a mass of blood. There was more than an ample amount of evidence supporting the premise that defendant was on the receiving end of a very severe beating by many different individuals. The defendant claims that he had no recollection of the evening after the parking lot melee.

Our analysis must uncover if there were sufficient facts, if we view them in the light most favorable to the state, to support a finding of guilt beyond a reasonable doubt. *Id.* A statement made by the ac-

cused that he or she has no recollection of a collision, standing alone, might well be suspect. We find in this instance, however, that defendant's assertion of an absence of memory of the accident is supported by the evidence. *See State v. Wall,* 206 Kan. 760, 482 P.2d 41 (1971). In *Wall* the court accepted a similar explanation. The defendant was involved in an accident and, when apprehended, denied any knowledge of the accident. The defendant's only recollection was awakening in a field on the opposite side of the road upon which the accident had occurred. A witness who saw the defendant about one-half mile from the scene of the accident testified that he was in a dazed condition and "looked like a person bewildered and couldn't comprehend." *Id.* at 762, 482 P.2d at 44. The defendant in *Wall* had multiple bruises and abrasions upon his face and both legs, a serious knee injury, and bruises upon his forehead. The *Wall* court recognized that there must be some element of awareness on the part of the driver of the fact of the collision. The court held that the necessary knowledge was "sufficient if the circumstances are such as to induce a reasonable person a belief [*sic*] that collision has occurred." *Id.* at 764, 482 P.2d at 45. Despite the court's broad interpretation of the knowledge required sufficient to maintain a conviction, the *Wall* court concluded that the evidence failed to establish that the defendant had the requisite knowledge that the vehicle driven by him was involved in an accident.

Although our facts are not identical to those in the *Wall* decision, we are guided by the court's reasoning. In *Wall* the defendant's memory loss was apparently caused by the actual collision of the automobiles and the resulting head injuries that the defendant sustained. Our facts inform us that defendant here was severely beaten before the accident. We are not implying that an instantaneous injury affects a person's memory or knowledge any more or less than a prolonged exposure to a beat-

ing, but we do believe that the continued exposure of defendant to a beating severe enough to put him in fear of his life is at least as serious as those injuries noted in *Wall.* As a result of the severe beating that defendant sustained we cannot imply or infer that he had actual or constructive knowledge of the accident. The defendant had been violently beaten, sustained facial injuries, and was covered in an abundance of blood. We believe that the trial justice committed error in failing to grant defendant's motion for a judgment of acquittal.[2]

◼ Furthermore, in viewing the facts in the light most favorable to the prosecution, we believe that the evidence was insufficient to support a verdict of guilt beyond a reasonable doubt. Because we find that there was insufficient evidence to support the premise that defendant knew or should have known that he was involved in an accident, any retrial of defendant is barred. *State v. Perkins,* 460 A.2d 1245, 1247 (R.I. 1983); *see also Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). As a result the "only 'just' remedy available for [this] court is the direction of a judgment of acquittal." *Id.* at 18, 98 S.Ct. at 2151, 57 L.Ed.2d at 14.

Relying on the disposition of the previous issue, we need not reach the merits of the defendant's remaining claims.

Consequently, the defendant's appeal is sustained. The judgment of the Superior Court is reversed, and the papers of this case are remanded to the Superior Court.

WEISBERGER and LEDERBERG, JJ., not participate.

---

**2.** In the scienter footnote of the *Szarek* decision we noted an extrajurisdictional case that stood for the proposition that proof of impact alone was sufficient to raise an inference of knowl-

edge adequate to withstand a motion for judgment of acquittal. In this instance that inference is overcome by overwhelming evidence to the contrary.