**STATE**

v.

**Lamphone VORGVONGSA.**

**No. 94–752–M.P.**

Supreme Court of Rhode Island.

Feb. 16, 1996.

Jane McSoley, Aaron Weisman, Asst. Attys. Gen., for Plaintiff.

John F. Cicilline, Providence, for Defendant.

## OPINION

BOURCIER, Justice.

This case comes before the court on the state's petition for certiorari.

On October 7, 1994, a Superior Court jury found the defendant, Lamphone Vorgvongsa, guilty of the murder of Sonexay Phommachanh. The trial justice thereafter on October 31, 1994, granted a motion for a new trial. This court on March 23, 1995, granted the state's petition to review the Superior Court order granting the new trial.

# I

## Case Travel and Facts

On March 2, 1990, Sonexay Phommachanh (Phommachanh) was shot and killed on Moy Street in the city of Providence. Two people were indicted for that murder, Chantha Leuthavone (Leuthavone) and Lamphone Vorgvongsa (Vorgvongsa). Leuthavone was tried first and convicted by a jury of having aided and abetted Vorgvongsa in the murder. That conviction was affirmed by this court on April 14, 1994.[1] The defendant here, Vorgvongsa, was later tried for the murder and convicted on October 7, 1994. His motion for a new trial was granted by the trial justice, and the order entered thereon is the subject matter here for review.

There were no eyewitnesses to the murder concerned in this case. The state's prosecution was based on circumstantial evidence stemming from the trial testimony of nine witnesses, three of whom had been with the deceased on the night of his murder seconds prior to his being shot. The other six witnesses were police personnel, an expert from the Rhode Island State Crime Laboratory, and a Deputy State Medical Examiner.

On March 2, 1990, some friends of Viengsavoth Syharath who knew he was leaving this state to take up residence in California gathered in a second-floor apartment at 29 Moy Street in Providence to wish him well. At about 10:15 p.m., the party guests were enjoying food, beer, and cognac while seated on the floor in the unfurnished living room in the apartment, when one of the guests, the victim, Phommachanh, went over to Leuthavone, and offered him a drink of cognac. Leuthavone refused the cognac, and Phommachanh, speaking in Laotian, called him a "chicken." Leuthavone, angered by that name, got up from his seated position and pushed Phommachanh. A pushing and grabbing melee erupted, and in short order, some guests began scattering for shelter while others attempted to quell the fracas. Within minutes, despite broken plates and glass all over the living room floor, peace settled in on the festive skirmish, but the party spirit had understandably dissipated and the guests began leaving the apartment. Leuthavone and the defendant, Vorgvongsa, were the first to leave. Others followed and gathered on the sidewalk in front of the apartment to bid their last farewells. Leuthavone and Vorgvongsa, however, were not among those talking on the sidewalk, but Phommachanh, whose fertile "chicken" epithet had triggered the party fracas was there, attempting to persuade the party guests to return to the apartment and resume the social occasion. As Phommachanh was pleading with the guests, a silver Toyota, with Leuthavone and Vorgvongsa as driver and passenger, drove up to the scene. Leuthavone exited the Toyota and approached Phommachanh, speaking briefly to him in Laotian. The others present, assuming that all was now well, decided to return to the apartment. As they did, Leuthavone and Vorgvongsa remained outside. Within minutes, however, Leuthavone and Vorgvongsa did reenter the apartment together.

They did not, however, join the other partygoers in the living room. Instead, they walked directly through the living room and into the kitchen. At this point, Phommachanh, who was with the other guests, walked over to the kitchen and extended his hand to shake hands with Leuthavone and to apologize for having earlier called him a "chicken." Without warning, Leuthavone pushed Phommachanh back into the living room and came after Phommachanh with a handgun. Immediately behind Leuthavone, the defendant Vorgvongsa rushed out, also with gun in hand. Phommachanh tried to find shelter by hiding behind some of the partygoers and was moving about the living room. Vorgvongsa was pointing his handgun around the room, looking for Phommachanh, and when he located him, Vorgvongsa attempted to shoot him, but the handgun misfired several times. Vorgvongsa then began banging the gun on its side, attempting to remedy the cause of its misfiring. The party guests began running for cover. Leuthavone also attempted to shoot Phommachanh, but his weapon also misfired. Leuthavone then unloaded and reloaded his gun, hoping that it would then properly function.

---

1. *State v. Leuthavone,* 640 A.2d 515 (R.I.1994).

As Leuthavone was reloading his gun, one of the partygoers, sensing that Phommachanh was targeted for doom, pushed Phommachanh toward a stairway exit leading from the apartment and told him to go. Phommachanh ran down the stairway. Leuthavone and Vorgvongsa then followed Phommachanh down the stairway, and about fifteen seconds later three shots were heard from the Moy Street sidewalk area. At that, Annette St. Louis (St.Louis) one of the ill-fated party guests, who fortuitously during the apartment gun chase had telephoned for 911 assistance from an apartment bedroom, ran out of the bedroom and saw that all of the party guests except Phommachanh, Leuthavone, and Vorgvongsa were present. She then ran down the exit stairway and out onto Moy Street. She did not see Leuthavone or the defendant, Vorgvongsa, and she noticed that the silver Toyota they had arrived in earlier was gone. She looked a short distance away and saw rescue-wagon personnel exiting their vehicle to tend to someone lying face down on the sidewalk. It was Phommachanh. He had been fatally shot in the back.

A short time later police responded and, after preliminary questioning of some of the party guests, learned that Leuthavone lived nearby at 34 Homer Street. Police went to that address, saw the silver Toyota parked there, and while surveilling the car, observed Leuthavone and another person, not Vorgvongsa, leave 34 Homer Street and enter the Toyota. As the police approached, Leuthavone, seated in the passenger seat, attempted to hide and conceal a gun under his seat. He was arrested and the gun seized. When the gun was later test fired, the test-fired bullet, when compared with the fatal bullet recovered from Phommachanh's body, confirmed that the bullet that killed Phommachanh had not been fired from Leuthavone's gun. Vorgvongsa was later arrested, but his gun was never found.

## II

### The New Trial Motion

■■■ In reviewing a trial justice's ruling on a motion for new trial, we accord great weight to the factual findings made by the trial justice. We will not disturb those find-

ings, absent our determination from the record that the trial justice, in making his or her findings, has overlooked or misconceived material trial evidence or was otherwise clearly wrong. *State v. Mercado*, 635 A.2d 260, 265 (R.I.1993); *State v. Henshaw*, 557 A.2d 1204, 1207 (R.I.1989). The burden of persuading this court of any error on the part of the trial justice rests upon the party alleging such error. *State v. Howard*, 114 R.I. 731, 738, 339 A.2d 259, 263 (1975).

In this case, the state asserts that the trial justice erred in setting aside the jury's verdict because he not only overlooked material trial evidence, but also misconceived the probative force of the circumstantial evidence upon which reasonable minds could differ.

■■■ When ruling upon a motion for new trial, it is "crucial" for the trial justice to articulate the facts upon which his or her ruling is made. *State v. Caruolo*, 524 A.2d 575, 585 (R.I.1987). The trial judge should set out in some reasonable manner the material factual evidence or the absence thereof, direct or circumstantial, upon which his or her ruling is based. *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994); *State v. Benevides*, 425 A.2d 77, 81 (R.I.1981). As noted in *Henshaw*, 557 A.2d at 1208, "[t]he trial justice need not analyze all the evidence presented, but should [however] state the motivation for his or her ruling." In this case, the trial justice failed to set out in any reasonable manner the material factual evidence or the lack thereof that prompted him to say:

"As I said, I don't believe—I did not believe Katta and with Annette I said I thought she was a truthful, forthright witness, but I must pass on a new trial and in exercising my independent judgment I must do so in light of the charge to the jury which is presumed to be correct and fair to the state and to the defendant. I specifically told the jury when discussing beyond a reasonable doubt that mere suspicion, however strong, will never sustain a verdict of guilty. I not only disagree with the jury, but I find in exercising my independent judgment and by a fair preponderance of the evidence that substantial justice was not done by the verdict of this

jury, and, therefore, I grant a motion for new trial."

For a trial justice simply to say that he or she does not agree with the jury's verdict, without stating the basis for his or her disagreement, is of little assistance to this court when called upon to review the trial justice's decision. All that can be implied from the sparse general statement of the trial justice in this case is that he believed that the jury's verdict was based solely upon mere suspicion, yet he did not say that is what the jury did in fact base its verdict upon.

■ Because of the inadequacies we find in the trial justice's new trial decision, we will independently review the trial evidence, accepting as conclusive, however, for purposes of our review, the witness credibility determinations made by the trial justice.

The trial justice in his decision noted that nine witnesses testified in the state's case. The defendant presented no defense. He stated that of the state's nine witnesses, only three were present at the going-away party and "really added anything to the trial." Of the three, he found St. Louis to be an "extremely credible witness." He found however that the other two, Katta Keophilivanh (Keophilivanh), referred to as "Katta" in the transcript, and Sunthorn Thongsvath (Thongsvath), were "totally unbelievable." [2]

As for the remaining six state's witnesses, the trial justice concluded that Patrolman Daniel Famiglietti and Detective Sergeant Timothy Patterson "really didn't offer anything" in regard to the guilt of the defendant "to guide the jury as to guilt beyond a reasonable doubt." He described the testimony of Lieutenant Edward Downing from the Bureau of Criminal Identification (BCI), Robert Hathaway (Hathaway) from the Rhode Island State Crime Laboratory, and Dr. Francis M. Garrity (Dr. Garrity) from the State Medical Examiner's office as being "nil" with regard to its probative value as to the guilt of the defendant.

We will review the material trial evidence in the record, mirrored by the trial justice's above findings.

The trial testimony from St. Louis revealed that she was employed as a senior quality-control laboratory technician in Connecticut, was Keophilivanh's girlfriend, and his guest at the going-away party in question. She testified that she and Keophilivanh arrived at the party at about 9:15 p.m., and at that time there were about eight others present, all Laotian, and speaking in their native tongue. The guests were all seated on the floor in the living-room area, some eating food and some drinking beer and cognac.

According to St. Louis, at about 10:15 p.m., Phommachanh, one of the partygoers, offered Leuthavone a drink of cognac. Leuthavone refused the drink and Phommachanh called him a "chicken." That name angered Leuthavone. He then stood up and pushed Phommachanh, and a brief tussle that involved pushing and grabbing ensued. When the tussle ended, broken glass and dishes littered the floor, and Leuthavone and his friend Vorgvongsa left the party. All the other guests remained. Shortly thereafter, the party ended, and some of the guests, including St. Louis, left the apartment. As they were extending farewells on the sidewalk in front of the apartment, and as Phommachanh was attempting to persuade them to return to the apartment, a silver Toyota approached them. St. Louis saw Leuthavone get out of the car and walk over to talk briefly with Phommachanh. She could not see the other occupant in the car but later determined that it was Vorgvongsa. St. Louis and the others then acquiesced to Phommachanh's pleas to return to the apartment. Leuthavone and the other occupant in his silver Toyota, however, remained outside. Shortly thereafter, St. Louis saw Leuthavone and the defendant Vorgvongsa come into the apartment. She noticed, however, that they did not rejoin the party group, but instead went directly into the kitchen. At that point she saw Phommachanh start to walk toward

---

2. While not questioning the trial justice's determination of Keophilivanh's "totally unbelievable" status, we note that earlier in the trial, the trial justice said that both Keophilivanh and St. Louis "both say basically the same thing," referring to their testimony regarding what took place in the apartment when the defendant and his friend Leuthavone returned to the party with their guns.

the kitchen, and as he arrived at the kitchen doorway, she saw him extend his hand so as to shake hands with Leuthavone, and he appeared to offer an apology. She saw Leuthavone suddenly rush out of the kitchen, push Phommachanh back into the group of people in the living room, and then come after Phommachanh with a handgun. She then saw the defendant Vorgvongsa follow Leuthavone out in pursuit of Phommachanh and saw that Vorgvongsa also carried a handgun. She next saw Vorgvongsa point the gun at Phommachanh and attempt several times to shoot him, but the gun misfired. She saw Leuthavone also try to shoot Phommachanh, but his gun also misfired. She then saw Vorgvongsa banging his gun on its side to free the firing mechanism and also saw Leuthavone unload and reload his gun. St. Louis testified that at that point she saw someone in the group push Phommachanh toward a stairway next to the kitchen and tell him to "go." As that was being said, she ran into an adjoining bedroom for shelter. As she ran into the bedroom, she saw Phommachanh heading for the stairway. Some "fifteen seconds" to "less than a moment" later she heard three gunshots. She came out of the bedroom and saw that only three of the people who had earlier been in the living room were missing. Those three were Leuthavone, the defendant Vorgvongsa, and Phommachanh. She then ran down the stairway and out onto Moy Street where she saw Phommachanh lying face down on the ground and rescue personnel responding. She did not see anyone else, and noticed that the silver Toyota was no longer where Leuthavone had parked the vehicle when he returned to the apartment with the defendant Vorgvongsa.[3]

Relying solely upon the testimony of St. Louis, a jury could certainly have concluded that, (1) Leuthavone and Vorgvongsa had returned, with guns, to the apartment to avenge Phommachanh's insult to Leuthavone; (2) that once in the apartment both Leuthavone and the defendant brazenly, in full view of the guests, pursued Phommachanh and tried several times to shoot him; (3) that only three people ran out of the apartment, Leuthavone and Vorgvongsa, who were armed with handguns, and Phommachanh, the third person, who was unarmed; (4) that within "fifteen seconds" or "less than a moment" thereafter, the unarmed person, Phommachanh, had been fatally shot in the back; and (5) the two armed gunmen had fled the scene in the silver Toyota. That was St. Louis's testimony.

We take up next the testimony of Patrolman Famiglietti, Detective Sergeant Patterson, Lieutenant Downing, Hathaway from the Rhode Island State Crime Laboratory, and Deputy State Medical Examiner Dr. Garrity. The trial justice in his decision on the new trial motion expressly found all of their testimonial evidence to be "nil" and of no probative value whatsoever to the jury in determining the defendant Vorgvongsa's culpability. We are persuaded to the contrary. The evidence from those witnesses, picking up from where St. Louis's testimony ends, would certainly have permitted the jury to conclude by reasonable inference that it was the defendant Vorgvongsa who had fired the fatal shot into the victim's back on Moy Street. That collective evidence showed that, (1) Leuthavone's silver Toyota was located at 34 Homer Street, not far from 29 Moy Street, within an hour or so after the shooting; (2) that Leuthavone was seen leaving 34 Homer Street and getting into the silver Toyota; (3) that Leuthavone was arrested, and while so being arrested, attempted to hide and conceal a handgun under the front seat in the silver Toyota; (4) that the handgun was later test fired and the bullet therefrom was later compared with the bullet removed from the body of Phommachanh by the Deputy Medical Examiner who performed the autopsy; and (5) that the bullet comparison was performed at the Rhode Island State Crime Laboratory by its expert, Hathaway, and found not to have been fired from Leuthavone's gun. Hence, the fatal bullet could only have been fired from the

---

**3.** Keophilivanh, one of the state's witnesses, testified that he saw a third man in the silver Toyota. The trial justice, however, rejected all of Keophilivanh's testimony, referring to Keophilivanh as a perjurer. Accordingly, we conclude, as St. Louis testified, that there were only two people in the Toyota, Leuthavone and the defendant, Vorgvongsa.

gun in the hand of the only other armed person pursuing Phommachanh down Moy Street, that person was the defendant, Vorgvongsa. While mere presence at the scene of a crime in and of itself is not sufficient to prove an element of a crime beyond a reasonable doubt, it is a factor that a jury can take into account in deciding the guilt of a defendant, especially on the particular facts present in this case. *State v. Szarek,* 433 A.2d 193, 197 (R.I.1981). The trial justice's finding that the trial testimony from the six witnesses who had not attended the party was of absolutely no probative value to the jury and was simply "nil" indicates to us that he overlooked and misconceived the validity and probative value of that important trial evidence. Their collective testimony served to exclude Leuthavone as the murderer, leaving the defendant Vorgvongsa as the only person on Moy Street at the time of the shooting who could have murdered Phommachanh. Actual eyewitness testimony to the commission of a crime has never been an absolute essential to conviction. Circumstantial evidence is as fully probative to a jury as is direct evidence. *Id.* at 196; *State v. Rose,* 112 R.I. 402, 407, 311 A.2d 281, 284 (1973). As this court said in *Caruolo,* 524 A.2d at 581:

> "[T]he state may rest its case entirely upon circumstantial evidence without disproving every possible speculation or inference of innocence as long as the totality of the circumstantial evidence offered constitutes proof of guilt beyond a reasonable doubt. *In re Derek,* 448 A.2d 765, 768 (R.I.1982); *State v. DaRocha,* 121 R.I. 182, 187, 397 A.2d 500, 503 (1979)."

■ Accordingly, we conclude that the direct evidence trial testimony of St. Louis, whom the trial justice had found to be "extremely credible," coupled with the additional probative evidence, both direct and circumstantial, from Officers Famiglietti, Patterson, and Downing and from Hathaway and Dr. Garrity, was more than sufficient to permit a reasonable jury to conclude the guilt of the defendant beyond a reasonable doubt. St. Louis's uncontradicted testimony clearly established the defendant Vorgvongsa's intent, motive, premeditation, presence, and opportunity to commit the murder. The police testimony and the expert opinion testimony from Dr. Garrity and Hathaway clearly established that the fatal bullet had not been fired from Leuthavone's gun, leaving the defendant Vorgvongsa as the only other armed person on Moy Street who could have committed the murder.

The state's petition for certiorari is granted. The order granting the defendant Vorgvongsa's motion for a new trial is quashed. The case is remanded to the Superior Court with directions to deny the defendant's motion for a new trial, to reinstate his conviction, and for sentencing.

MURRAY, Justice, dissenting.

I respectfully dissent. I would affirm the trial justice's decision in granting the defendant's motion for a new trial. As with the majority, I too accept the trial justice's findings of credibility, but I do not believe that the trial justice abused his discretion. I do not find that the trial justice's decision was clearly wrong or that he misconceived or overlooked a material fact.

This court has clearly delineated the function of a trial justice when considering a motion for a new trial. When deciding a motion for a new trial, the trial justice begins by undertaking a three-step analysis while placing himself or herself in the role of a "thirteenth juror," exercising "independent judgment on the credibility of witnesses and on the weight of the evidence." *See State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994). *See also State v. Marini,* 638 A.2d 507, 515 (R.I. 1994). In the first analysis, the trial justice must consider the evidence in the light of the charge to the jury, which is presumed to be correct and fair to the defendant. *Banach,* 648 A.2d at 1367. In the second analysis, "the trial justice must determine his or her own opinion of the evidence." *Id.* The trial justice must then weigh the credibility of the witnesses and other evidence, accepting or rejecting conflicting testimony. *Id.* In the third analysis, "the trial justice must determine, by an individual assessment of the evidence and in light of the charge to the jury, whether the justice would have reached a different result from that of the jury." *Id.*

If the justice's conclusion is in accord with the jury's verdict, then a motion for a new trial should be denied. *Id.* A new trial must be denied "if the trial justice finds that the evidence is balanced or reasonable minds could differ." *State v. Dame,* 560 A.2d 330, 333 (R.I.1989).

However, a new trial may be granted if the trial justice determines that he or she would have reached a different result from that of the jury and "if it is specifically found that the verdict is against the fair preponderance of the evidence and fails to do substantial justice." *Dame,* 560 A.2d at 333. For this analysis the trial justice takes on "the role of a super juror because of his or her more experienced judgment." *See State v. Girouard,* 561 A.2d 882, 890 (R.I.1989).

It is well settled that a trial justice's ruling on a motion for a new trial is entitled to great weight and will not be disturbed unless we find that he or she has misconceived or overlooked material evidence or was otherwise clearly wrong. *See Dame,* 560 A.2d at 332–33; *Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's, Inc.,* 474 A.2d 436, 444 (R.I.1984); *Fox v. Allstate Insurance Co.,* 425 A.2d 903, 907 (R.I.1981). Although the trial justice must offer a sufficient rationale for his or her decision, he or she "need not refer to all the evidence supporting the decision but need only cite evidence sufficient to allow [the reviewing] court to discern whether the justice has applied the appropriate standards." *Banach,* 648 A.2d at 1367. This task can be accomplished by placing in the record one or two sentences giving his or her reasoning on each point of the analysis. *Id.* Moreover, "the moving party bears the burden of convincing [the reviewing] court that the trial justice did not conscientiously apply these standards." *Id.*

After a careful review of the record before us, I conclude that the trial justice in the instant case engaged in a complete and proper analysis while fulfilling his role as the thirteenth juror. The record clearly reflects the trial justice's reasoning regarding each point of the applicable analysis under *Banach.* The trial justice initially found that there were only three witnesses who were able to provide any testimony regarding de-fendant's guilt: Keophilivanh, Thongsvath, and St. Louis. After an independent assessment of each of these witnesses, the trial justice found that the only credible witness was St. Louis. Specifically, in reviewing Keophilivanh's testimony, the trial court found him to be

> "a totally incredible witness. He was evasive in his answers. He tried to tailor his answers to what he perceived and what he thought the verdict should be. He had prior inconsistent statements and his explanation and recitation of what happened at the reservoir * * * is totally unbelievable."

The court similarly found the witness Thongsvath to be incredible, stating:

> "It was apparent to this Court, in reviewing [his testimony] and exercising my independent judgment, that [Thongsvath] was merely reciting what someone told him. He used a name that he was given by someone else. He didn't know the defendant. He couldn't even identify this defendant. I find that his testimony should not be given any weight. He merely, in this Court's opinion, recited what someone else told him and he didn't have those facts very accurately."

Finally, the trial justice considered St. Louis's testimony and found her to be the only credible witness:

> "I find that Annette St. Louis was an extremely credible witness. Her demeanor on the stand was, in this Court's opinion, good. She answered questions as forthright as possible, considering the time lapse. She acknowledged when she didn't know answers or was not sure of answers."

The trial justice next determined, by an individual assessment of the evidence and in light of the charge to the jury, that he would have reached a different result from that of the jury. In support of his findings, the trial justice noted that although St. Louis was a credible witness, she "did not see th[e] defendant run from the house, and she did not, while she did say she saw this defendant with a weapon in his hand, she did not see the defendant go down the stairs and allegedly chase the victim, who's referred to as [Phom-

machanh] during the course of this trial." He then reiterated his charge to the jury and indicated that "when discussing beyond a reasonable doubt * * * mere suspicion, however strong, will never sustain a verdict of guilty." The trial justice thereafter concluded that "in exercising my independent judgment and by a fair preponderance of the evidence * * * substantial justice was not done by the verdict of this jury."

Upon review of the record, I do not find that the trial justice was clearly wrong in his conclusion. First, it is noteworthy that St. Louis does not understand Laotion and therefore could not understand much of the altercation between Phommachanh and Leuthavone since they were speaking in that language. Second, it is significant that the jury was confused about St. Louis's testimony and requested that the trial court "retreive the part of Annette St. Louis's testimony that states at which point she left the apartment after she heard the shots fired." In these circumstances, where the only credible witness was St. Louis, it cannot be said that the trial justice was clearly wrong in concluding that the jury verdict was against the fair preponderance of the evidence and failed to do substantial justice.

Clearly the trial justice performed all the procedural analyses required of him in granting defendant's motion for a new trial. The state nevertheless challenges the trial justice's determination of the credibility of witnesses and his decision to grant the motion for a new trial. We have noted on numerous occasions that it is the trial justice who is in the unique position to assess the credibility of witnesses. *See Banach*, 648 A.2d at 1368 ("it is the task of the trial justice to determine whether the evidence presented is sufficiently credible to warrant a new trial"); *Vitullo v. Ambrosino*, 78 R.I. 354, 357, 82 A.2d 404, 406 (1951) ("[t]he trial justice who saw and heard [the witnesses] testify is in a much better position than this court to determine [the issue of credibility]"); *Kiernan v. Brennan*, 73 R.I. 229, 231, 53 A.2d 926, 927 (1947) ("[t]he trial justice had the opportunity of seeing and hearing the witnesses while testifying, an advantage that we do not have and which is of great importance in the de-

termination of issues of fact upon conflicting testimony from interested witnesses"). As the Supreme Court stated in *Anderson v. City of Bessemer*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 529 (1985), "[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Because the trial justice is able to hear testimony live and to view witnesses as they testify, his or her findings on the issue of credibility are entitled to great deference on appeal. The trial justice's findings on credibility are therefore conclusive unless an examination of the record discloses that the "decision was clearly wrong or unless the trial justice, in reviewing the evidence, overlooked or misconceived relevant and material evidence." *Banach*, 648 A.2d at 1368 (quoting *Fontaine v. State*, 602 A.2d 521, 525 (R.I.1992)); *see also Rodriques v. Santos*, 466 A.2d 306, 312 (R.I.1983).

In the present case it cannot be said that the trial justice overlooked or misconceived material evidence relating to a critical issue or that his findings on credibility were clearly wrong. The trial justice had the opportunity to assess the credibility of the witnesses, to observe the witnesses as they testified, and to determine the weight to be given to their testimony. In concluding that Annette St. Louis was the only credible witness and that the testimony at trial could not support a jury verdict of guilty, the trial justice merely "believed one set of facts and disbelieved the other" and made "sound credibility findings by assessing the facts and the totality of the circumstances before him." *Banach*, 648 A.2d at 1368 (quoting *Fontaine*, 602 A.2d at 526).

Upon reviewing the record as a whole, I am persuaded that the trial justice clearly articulated his reasoning regarding each step of the required analysis when deciding a motion for a new trial in the instant case. In accordance with our settled rule that we do not disturb a trial justice's findings of credibility and his or her conclusions, I find that the evidence adduced at trial, which the trial justice heard and assessed with particularity, supports his decision that the defendant be

granted a new trial. Because I do not believe that the trial justice abused his discretion, I would affirm the trial justice's granting of the defendant's motion for a new trial.